UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WESTERN SURETY COMPANY,
a South Dakota surety company,

                Plaintiff,               CASE NO. 16-CV-11055
                                       HONORABLE GEORGE CARAM STEEH

    v.

FUTURENET GROUP, INC., a Michigan
corporation, MOTOR CITY DEVELOPER,
LLC f/k/a FUTURENET DEVELOPER, LLC,
a limited liability company, FUTURENET
SECURITY SOLUTIONS, LLC, a limited
liability company, PARIMAL MEHTA,
individually, DIPIKA MEHTA, individually,
JIGNESH MEHTA, individually, and CAPITAL
FUNDING SOLUTIONS, INC,

                Defendants.

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION (DOC. 2)**

## I. INTRODUCTION

Defendant FutureNet Group, Inc. ("FNG") operates a construction business, and it has been engaged as the general contractor on a number of government projects. Plaintiff Western Surety Co. ("Western") has provided payment and performance bonds for some of those projects.  FNG and codefendants Motor City Developer, LLC ("Motor City"), FutureNet Security Solutions, LLC ("FNSS"), Parimal Mehta, Dipika Mehta, and Jignesh Mehta signed an agreement in which they agreed to, *inter alia*, indemnify Western against any claims made under the bonds and post collateral at Western's

request.  These defendants (i.e., all of the defendants except for Capital Funding Solutions, Inc. ("Capital")) will hereinafter be referred to as the "Indemnitors."  Western has received numerous claims under the bonds and has paid millions of dollars to various claimants.  Western alleges that the Indemnitors have failed to comply with the terms of the indemnity agreement.

Western seeks a preliminary injunction ordering, *inter alia*, that the Indemnitors deposit $8,250,000 in collateral with Western.  (Pl.'s Mot., Doc. 2; *see also* Pl.'s Reply, Doc. 17; Pl.'s Hr'g Br., Doc. 25; Pl.'s Supplemental Br., Doc. 39; Pl.'s Reply to Defs.' Supplemental Br., Doc. 41).  The Indemnitors oppose the motion.  (*See* Defs.' Resp., Doc. 8; Defs.' Hr'g Br., Doc. 33; Defs.' Supplemental Br., Doc. 40; Defs.' Reply to Pl.'s Supplemental Br., Doc. 43).  The Court previously entered a stipulated order in lieu of a temporary restraining order.  (Doc. 20).  That order states that the Court shall have the authority to enforce the terms of an agreement that was reached between the parties.  (Doc. 20; *see also* Doc. 35-2 (the agreement)).  The Indemnitors contend that the terms of that stipulated order and the associated agreement between the parties are sufficient to protect Western's interests pending an adjudication of the merits.

On May 3, 2016, a hearing was held on the preliminary-injunction motion.  Western called its senior claims counsel, Trey Felty, as a witness, and the Indemnitors called defendant Parimal Mehta.  The parties also submitted a number of exhibits.  At the end of the hearing, the Court stated that it was taking the matter under advisement and requested supplemental briefing from the parties.  The parties have submitted their supplemental briefs and replies and the Court will now rule on the motion.  For the reasons explained below, the Court will grant Western's motion in part and deny it in

part.  The Court will enjoin the Indemnitors from transferring or encumbering their assets except in the ordinary course of business or to satisfy necessary living expenses. Because the existing agreement between the parties (Doc. 35-2) already prohibits the Indemnitors from doing so, the Court's preliminary injunction will incorporate that agreement by reference.  The Court will also require the Indemnitors to provide Western full and complete access to its financial books and records.  The Court will not require the Indemnitors to post collateral.

## II.  FACTUAL BACKGROUND

Parimal Mehta founded FNG in 2003 and remains the CEO and owner.  (5/3/16 Hr'g Test. of Parimal Mehta [hereinafter Mehta Hr'g Test.]).  FNG now has over 200 employees. (*Id.*).  FNG operates a construction business and is the general contractor on a number of government contracts.  (*Id.*).  It serves as a project manager, and it hires subcontractors to complete the actual construction.  (*Id.*).  FNG also has an information-technology division, which provides services to the federal government and various state and local governments and commercial entities.  (*Id.*).  Motor City and FNSS are wholly owned subsidiaries of FNG.  (*Id.*).  FNSS, in particular, was purchased from the firearms manufacturer Smith & Wesson in 2012.  (*Id.*).  It manufactures and services "active vehicle barriers" which are used to protect over 500 military installations and other federal and commercial buildings.  (*Id.*; *see also* FutureNet Group Marketing Materials, Ex. 501).[1]

---

[1] "Ex." shall refer to the exhibits submitted at the May 3, 2016, motion hearing.

Since 2005, Western and its parent company CNA Financial Corporation have provided payment and performance bonds for FNG.  (Mehta Hr'g Test.; *see also* Performance and Payment Bonds, Ex. 102).  In consideration of Western's bonding services, the Indemnitors executed an indemnity agreement in 2012.  (General Agreement of Indemnity, Ex. 101).  Two relevant provisions of the indemnity agreement are an indemnity clause and a collateral-security clause:

> 3. INDEMNITY. Indemnitors agree and covenant that they shall
> a. upon demand indemnify and save the Surety [that is, Western] harmless from and against any Loss which the Surety may pay or incur. In the event of any payments made by the Surety in the good faith belief of their necessity, the Indemnitors agree to accept the voucher or other evidence of such payments as *prima facie* evidence of the propriety thereof, and of the Indemnitors' liability therefore to the Surety; and
> b. deposit with the Surety on demand collateral security in an amount and kind satisfactory to the Surety in its sole discretion whenever the Surety shall reasonably determine that such collateral is necessary to protect it from Loss whether or not the Surety has made any payment. The Surety shall have the right to use the deposit, or any part thereof, in payment or settlement of any Loss . . . .

(*Id.* ¶ 3).  The Indemnitors also agreed to hold "any money earned on any Bonded Contract . . . in an actual, equitable, or constructive trust for the completion of the Bonded Contract and for the payment of . . . [contract] obligations."  (*Id.* ¶ 11).  Further, a default of the indemnity agreement triggers the "assign[ment], transfer, and set[ting] over to the Surety [of] all of [the Indemnitors'] rights under the Bonded Contracts."  (*Id.* ¶ 9(b)).  A default also triggers a grant to Western of "a security interest in all property, rights, and assets of the Indemnitors, including, but not limited to, all inventory, equipment, instruments, investments, contract rights and proceeds, insurance, accounts, and deposits."  (*Id.* ¶ 10).

-4-

FNG began experiencing financial problems in 2014. (Mehta Hr'g Test.). The winter of 2013-14 was particularly harsh, resulting in numerous costly project delays, and FNG had underbid on a number of contracts due to overly optimistic cost estimates. (*Id.*). At some point in 2015, FNG began having trouble paying subcontractors and suppliers on various contracts bonded by Western. (*See* Surety Claim Payment Spreadsheet, Ex. 107). These subcontractors and suppliers submitted claims to Western. By the time of the May 3, 2016, motion hearing, Western had paid $7,748,144.68 to settle various claims. (Projected Loss Summary, Ex. 117; Surety Claim Payment and Recoveries, Ex. 106).

Western's claims counsel, Mr. Felty, tried to "work out" a "payment plan" with FNG, so that FNG could reimburse Western for its losses, but FNG never agreed to a plan. (5/3/16 Hr'g Test. of Trey Felty [hereinafter Felty Hr'g Test.]; *see also* Repayment Agreement Demand Email, Ex. 118). FNG did agree to transfer to Western approximately $400,000 in payments it had received on one of its Western-bonded contracts, but FNG did not follow through with the agreement and never fully explained where the $400,000 went. (Felty Hr'g Test.; Email Regarding Northerly Island Project, Ex. 124). Mr. Felty also discovered that in April 2015 FNG had factored some of its receivables with defendant Capital, including receivables on at least one Western-bonded contract. (Felty Hr'g Test.; *see also* Instrument of Assignment to Capital Funding Solutions, Ex. 120).

After the payment-plan talks failed, Western mailed a letter to the Indemnitors[2] in September 2015 demanding that they deposit approximately $6 million in cash or cash equivalents with Western, pursuant to the collateral-security clause of the indemnity agreement. (Collateral Demand Letters, Ex. 103). Western attached a list of all of the claims it had paid thus far. Western mailed a second letter in February 2016 demanding $8,250,000. (*Id.*).

The Indemnitors never deposited the requested collateral. However, FNG has executed instruments of assignment on all five of its outstanding Western-bonded contracts. (Felty Hr'g Test.).[3] Under the instruments of assignment, the government's payments on the contracts go to an escrow agent, rather than to FNG. (*See id.*). FNG continues to provide project management services on at least three of these contracts however, at a cost to itself of approximately $30,000 per contract per month. (Mehta Hr'g Test.; *see also* Felty Hr'g Test.). The escrow agent has received over $3 million[4] in government payments on the assigned contracts. (Projected Loss Summary, Ex. 117). The escrow agent has paid $572,737.50 from this account to Western to reimburse

---

[2] Actually, the letter was addressed only to Parimal Mehta and another FNG employee. (*See* Collateral Demand Letters, Ex. 103). The parties have agreed, however, that the letter was effectively a demand on all of the Indemnitors. (*See* Doc. 20; Doc. 35-2 ¶ 7).

[3] Mr. Felty's hearing testimony on this point was not entirely consistent. He initially admitted that there had been an assignment on all of FNG's ongoing Western-bonded contracts. He then testified that "I wouldn't say all" of the remaining contracts had been assigned. He was unable to identify a single Western-bonded contract that had not been assigned, however.

[4] All amounts in this paragraph are based on exhibits submitted at the May 3, 2016, motion hearing. The actual amounts might have changed somewhat since then. Ultimately, the exact amounts are immaterial to the Court's ruling on the instant motion.

Western for its bond payments. (*Id.*). Western has also recovered $7,487 directly from FNG. (*Id.*). This means that Western's net losses currently stand at $7,167,919.28. (*Id.*). Based on Western's estimates of the remaining government payments, the amounts of the currently pending claims under the bonds, and the costs to complete the Western-bonded contracts, Western estimates that its losses under the bonds will ultimately total $7,480,647.28. (*Id.*). Western has also incurred various "costs and expenses," such as "professional fees," and likely will continue to incur such expenses as litigation in this case continues. (3/15/16 Felty Aff., Ex. 105, ¶ 8). As of mid-March 2016, those expenses totaled $185,720.97. (*Id.*).

In addition to demanding that the Indemnitors post collateral, Western filed a U.C.C. financing statement with the Michigan Department of State in June 2015, announcing Western's security interest in "all property, rights, and assets of the Indemnitors, including, but not limited to, all inventory, equipment, instruments, investments, contract rights and proceeds, insurance, accounts, and deposits." (U.C.C. Search Report for FutureNet Group, Ex. 511). This quoted language mirrors the language in the security-interest clause of the indemnity agreement. (General Agreement of Indemnity ¶ 10). In a subsequent amendment filed with the Michigan Department of State, Western attached the indemnity agreement. (*See* (U.C.C. Search Report for FutureNet Group). Multiple other creditors also have security interests in the personal property of various of the Indemnitors. (*See* U.C.C. Search Report for FutureNet Group; *see also* U.C.C. Search Report for FutureNet Security Solutions, Ex. 513). In particular, nonparties Plymouth Venture Partners and Fifth Third Bank and defendant Capital all have security interests that appear to have been perfected prior to

Western's security interest. (*See* U.C.C. Search Report for FutureNet Group;  U.C.C. Search Report for FutureNet Security Solutions).[5]  Moreover, nonparty Lexon Surety, which, like Western, bonded various contracts for FNG, also has a security interest. (*See* U.C.C. Search Report for FutureNet Group).  According to a liquidation analysis prepared by the consulting firm Conway MacKenzie, FNG currently owes some $2 million to Capital, $10 million to Plymouth Venture Partners, $850,000 to Fifth Third Bank, and $6 million to Lexon Surety.  (FutureNet Liquidation Analysis Prepared by Conway MacKenzie, Ex. 513).  According to the liquidation analysis, if FNG were to be liquidated now and if the proceeds were to be used to pay FNG's creditors, Capital would be paid in full, Plymouth Venture Partners would be paid in part, and Fifth Third Bank would receive nothing.  (*See id.*).  Western and Lexon would each recover a fraction of what they are owed.  (*See id.*).

Parimal Mehta testified that if the Court were to order the Indemnitors to post collateral now, FNG would go out of business.  (Mehta Hr'g Test.).  However, he explained that although FNG's construction business is no longer financially viable, FNG's IT business and FNSS's active-barrier business are both very profitable and are expanding.  (*Id.*).  FNG plans to close down its construction business and focus on IT and the active barriers.  (*Id.*).  Thus, Mr. Mehta believes that Western may receive a more substantial recovery if the Indemnitors are not forced to post collateral at this time and if FNG is able to successfully restructure its business.  (*Id.*).  FNG faces significant

---

[5] Unlike Western, these three entities do not appear to have a security interest in the personal property of the three individual Indemnitors (Parimal Mehta, Dipika Mehta, and Jignesh Mehta), however.   (*See* U.C.C. Search Report for FutureNet Group; U.C.C. Search Report for FutureNet Security Solutions)

financial obstacles, however, even if it is not forced to post collateral at this time.  FNG currently does not have a traditional source of credit and has relied on factoring services provided by Capital.  (*Id.*).  FNG plans to enter another nontraditional financing arrangement with a company called Money Works Direct so that FNG will be able to make payroll.  (*See* Defs.' Emergency Mot., Doc. 35; *see also* Money Works Direct Factoring Agreement, Doc. 35-3; Mehta Hr'g Test.).  FNG would receive some $750,000 under the arrangement and would have to pay back close to $1 million within a year.  (Mehta Hr'g Test.).  FNG is working with the Michigan Economic Development Organization and Invest Detroit to find a new traditional lender.  (*Id.*).

If FNG and its subsidiaries were to go out of business now, over 200 employees would lose their jobs.  (Mehta Hr'g Test.).  Only thirty of those employees are involved in FNG's construction business.  (*Id.*).  Mr. Mehta also contends that national security would be imperilled if FNG were to go out of business, since FNG provides IT services to the federal government and since FNSS provides and services active barriers installed at hundreds of government installations.  (*Id.*).  In particular, Mr. Mehta believes that only FNSS can service the active barriers because FNSS "ha[s] the patents."  (*Id.*).

As mentioned above, Western and the Indemnitors earlier reached an agreement in lieu of the Court's entry of a temporary restraining order.  (*See* Doc. 20).  Under the agreement, the Indemnitors generally agreed not to transfer or encumber any of their assets except in the ordinary course of business or to pay for necessary living expenses.  (*See* Doc. 35-2 ¶¶ 1, 2).  The parties agreed that the restriction will remain in effect until the Court rules on the preliminary-injunction motion.  (*Id.* ¶ 2).

-9-

### III.  LEGAL STANDARD

The purpose of a preliminary injunction "'is merely to preserve the relative positions of the parties until a trial on the merits can be held.'"  *Findlay Truck Line, Inc. v. Cent. States, Se. & Sw. Areas Pension Fund*, 726 F.3d 738, 746 n.4 (6th Cir. 2013) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)); *see also Harlem Algonquin LLC v. Canadian Funding Corp.*, 742 F. Supp. 2d 957, 962 (N.D. Ill. 2010) ("[P]reliminary injunctive relief is not appropriate if it gives to a plaintiff 'the actual advantage which would be obtained in a final decree.'" (quoting *W.A. Mack, Inc. v. General Motors Corp.*, 260 F.2d 886, 890 (7th Cir. 1958))).  The party seeking the preliminary injunction bears the burden of proving that "the circumstances clearly demand" the requested injunctive relief. *Serv. Employees Int'l Union Local 1 v. Husted*, 698 F.3d 341, 344 (6th Cir. 2012) (quoting *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002)) (internal quotation marked omitted).  A court must consider four factors in deciding whether to grant a preliminary injunction

> (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.

*Mich. Catholic Conference & Catholic Family Servs. v. Burwell*, 807 F.3d 738, 746 (6th Cir. 2015) (quoting *Jolivette v. Husted*, 694 F.3d 760, 765 (6th Cir. 2012)) (internal quotation marks omitted).  "These factors are not prerequisites that must be met, but are interrelated considerations that must be balanced together." *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991); *see also Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008) ("For

example, the probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury the movants will suffer absent the [preliminary injunction].").

## IV.  DISCUSSION

As explained below, Western has satisfied its burden of showing that preliminary injunctive relief is clearly warranted.  However, Western has not shown that the injunction should include an order requiring the Indemnitors to post $8,250,000 in collateral.  Such an order would result in substantial irreparable harm to the Indemnitors and their over 200 employees.  Such an order would not preserve the status quo pending trial.  Rather, the Court will enjoin the Indemnitors from transferring or encumbering their assets, except in the ordinary course of business or to satisfy necessary living expenses.  The Court will accomplish this by incorporating the existing agreement between the parties into the instant order.  Moreover, the Court will require the Indemnitors to provide Western with full access to its financial books and records.

### A.     Western Has a Strong Likelihood of Success on the Merits.

The first preliminary-injunction factor weighs in favor of Western.  Western has a high likelihood of ultimately succeeding on the merits in its claim for indemnification or other relief at trial, for a number of reasons.[6]

_____

[6] The Court makes the findings of fact and law in this section only for the purpose of ruling on the instant motion.  Moreover, these findings are based on the evidence before the Court at this time.  The Indemnitors have asserted a number of affirmative defenses and have denied many of the factual allegations, (*See* Defs.' Answer, Doc. 44), and moreover the parties have not yet conducted discovery.  So, it is possible that later evidence will demonstrate that Western is not entitled to relief.

First, Western is clearly entitled to be collateralized.     According to the language of the indemnity agreement, the Indemnitors must post collateral when Western "in its sole discretion . . . shall reasonably determine" the need for collateral, "whether or not [Western] has made payment" to a creditor. (General Agreement of Indemnity ¶ 3(b)). Western's two good-faith demand letters triggered the Indemnitors' duty to post collateral under this provision. *Cf. United Bonding Ins. Co. v. Stein*, 273 F. Supp. 929, 929-30 (E.D. Pa. 1967) (noting that "[i]n the instant case, the only conditions precedent to defendants' obligation [to post collateral] were the plaintiff's estimate that a reserve was necessary and its demand upon defendants for current funds in the amount of such reserve"). Moreover, it is well established that a court may order specific performance of a collateral-security provision. *See, e.g.*,  *Am. Motorists Ins. Co. v. United Furnace Co.*, 876 F.2d 293, 300 (2d Cir. 1989); *Safeco Ins. Co. of Am. v. Schwab*, 739 F.2d 431, 433 (9th Cir. 1984). Generally, damages are an insufficient remedy for breach of a collateral-security clause. *See Travelers Cas. & Sur. Co. of Am. v. Padron*, No. 5:15-CV-200-DAE, 2015 WL 1981563, at *9 (W.D. Tex. May 1, 2015) (unpublished) ("The vast majority of courts agree that a surety has no adequate remedy at law when it seeks specific performance to recover collateral prior to incurring loss.") (collecting cases). The reason is that a surety bargains for a collateral-security clause specifically for the purpose of *avoiding* a situation in which the surety's only option to obtain indemnification is to sue a potentially insolvent indemnitor for damages. "'If a creditor is to have the security position for which he bargained, the promise to maintain the security must be specifically enforced.'" *Schwab*, 739 F.2d at 433 (quoting *Marine Midland Trust Co. v. Alleghany Corp.*, 28 F.Supp. 680, 683-84 (S.D.N.Y. 1939)).

-12-

Second, Western is clearly entitled to compensation under the indemnity clause of the indemnity agreement. The Indemnitors agreed to indemnify and save Western harmless from any costs incurred by Western under its bond obligations. And they agreed "to accept the voucher or other evidence of . . . payments [under the bonds] as *prima facie* evidence of the propriety thereof." (General Agreement of Indemnity ¶ 3(a)). Such "[p]rovisions in indemnity agreements . . . providing that vouchers and other evidence of payment shall be prima facie evidence of the propriety thereof, have been upheld as not against public policy and enforced by the courts." *Transamerica Ins. Co. v. Bloomfield*, 401 F.2d 357, 362 (6th Cir. 1968); *see also Hanover Ins. Co. v. Quadrants, Inc.*, No. 11-11246, 2014 WL 1304328, at *6 (E.D. Mich. Mar. 31, 2014) (unpublished). As explained in the background section above, Western has presented evidence documenting its payments under the bonds. This documentation, which is unrebutted, is sufficient under the *prima-facie*-evidence clause to establish Western's entitlement to be indemnified in the amount of $7.1 million.

Third, Western clearly has a security interest in all of the Indemnitors' personal property. By the terms of the indemnity agreement, a default automatically creates a security interest on the part of Western in all of the Indemnitors' assets. Moreover, a default automatically transfers all of the Indemnitors' rights under the bonded contracts to Western. A default has occurred, since the Indemnitors failed to comply with, *inter alia*, the collateral-security clause of the indemnity agreement. Moreover, Western has perfected its security interest.

Fourth, Western may be entitled to damages due to the Indemnitors' apparent failure to comply with the "actual, equitable, or constructive trust" provision of the

-13-

indemnity agreement.  (General Agreement of Indemnity ¶ 11).  Western has repeatedly failed to pay subcontractors and other creditors.  This suggests that Western may have violated its obligation to hold the contract payments in trust for the completion of the contracts.

Beyond the express terms of the indemnity agreement, Western is also clearly entitled to relief under its right to equitable subrogation.  Under the equitable-subrogation doctrine, "a surety who pays the debt of another is entitled to all the rights of the person he paid." *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 137 (1962); *see also In re Larbar Corp.*, 177 F.3d 439, 443-44 (6th Cir. 1999); *City of Detroit v. Fid. & Deposit Co. of Md.*, 240 Mich. 213, 220-21, 215 N.W. 394, 396 (1927).  Western paid numerous claims on behalf of the Indemnitors and thereby became subrogated to the rights of these claimants. Therefore, Western may now seek reimbursement from the Indemnitors pursuant to these claims.

In sum, Western has established that, based on the indemnity agreement, Western is entitled to be collateralized by the Indemnitors, that it is entitled to be indemnified for its demonstrated costs thus far, that it has a security interest in all of the Indemnitors' personal property, and that it may be entitled to damages under the trust provision of the indemnity agreement.  And Western has also established that it has a right to equitable subrogation.  Thus, Western has a high likelihood of success on the merits, and therefore the first factor of the preliminary-injunction analysis weighs strongly in favor of Western.

-14-

B.     **Western Is Likely to Suffer Irreparable Harm in the Absence of a Preliminary Injunction.**

The second factor of the preliminary-injunction analysis also weighs in favor of Western: Western is likely to suffer irreparable injury without an injunction. This is most clear with respect to Western's rights under the collateral-security clause. Western bargained for the collateral-security clause specifically so that Western would not be placed in a situation in which its only hope of obtaining indemnification is a final judgment against the possibly judgment-proof Indemnitors. The longer Western has to wait for the enforcement of the collateral-security clause, the less likely it becomes that the clause will be effective and that Western will be able to obtain the benefit of its bargain. *See Am. Motorists Ins. Co. v. Pennsylvania Beads Corp.*, 983 F. Supp. 437, 441 (S.D.N.Y. 1997) ("[A]bsent enforcement of the . . . collateral security clause, plaintiff could . . . be relegated to an unsecured claim and therefore be forced to share its debtor's property with other creditors."); *see also Int'l Fid. Ins. Co. v. Solutions to Every Problem, Inc.*, No. 3:12-CV-37, 2012 WL 2576775, at *7 (E.D. Tenn. July 3, 2012) (unpublished) ("[C]ourts have routinely found that sureties suffer immediate, irreparable harm if they are denied receipt of collateral after liability has been asserted against them." (citation and internal quotation marks omitted)); *Amerisourcebergen Corp. v. Hood Med. Servs., Inc.*, No. 2:05-CV-794, 2005 WL 2230232, at *2 (S.D. Ohio Sept. 13, 2005) (unpublished).[7]

---

[7] As the Indemnitors point out, some courts have held that a violation of a collateral-security provision does not necessarily result in irreparable harm. *See Great Am. Ins. Co. v. Fountain Eng'g, Inc.*, No. 15-CIV-10068-JLK, 2015 WL 6395283, at *3-*4 (S.D. Fla. Oct. 22, 2015) (unpublished); *Westchester Fire Ins. Co. v. DeNovo Constructors, Inc.*, No. 15-CV-7940 (AJN), 2016 WL 1381821, at *2 (S.D.N.Y. Apr. 5,

Moreover, the evidence in the record shows that FNG is in dire financial straits. It no longer has a traditional source of credit and is millions of dollars in the hole with various creditors.  The evidence in the record also shows that the Indemnitors have not always been entirely upfront with Western about its financial situation and that funds have sometimes disappeared without an adequate accounting.  Therefore, the Court finds that Western would be likely to suffer irreparable injury without some form of injunction.

But the Court also finds that some protections have been put in place.  There is evidence that the receivables on all of FNG's outstanding Western-bonded contracts have been assigned to an escrow agent, thus ensuring that the receipts from these contracts will no longer be dissipated.  The Court also finds that it would be futile to order the Indemnitors to post collateral.  There is substantial evidence that the Indemnitors would be unable to post collateral at this time, given that most or all of their assets (with the possible exception of the receivables on the Western-bonded contracts,

_____

2016).  One court has reasoned,

> [c]ertainly, the purpose of a collateral security clause is to provide sureties with access to financial cushioning during the pendency of claims and, where violated, the surety suffers ongoing harm in the form of missing money, but, whatever the loss, whether to financial security or otherwise, it is monetary in character, and may be adequately remedied by a judgment on the merits.

*Great Am. Ins. Co.*, 2015 WL 6395283, at *3.  The Court finds these cases unpersuasive.  Western specifically bargained for the collateral-security clause and if something is not done to give it *some* effect at this stage, Western will never receive the benefit of that bargain.  Moreover, as explained below, in the instant case there is strong evidence indicating that the Indemnitors are facing serious financial problems, further confirming that Western is likely to suffer irreparable harm if something is not done at this point.  Finally, given that the Court at this stage will be ordering a freeze on the Indemnitors' assets rather than specific performance of the collateral-security clause *per se*, the reasoning from these cases is even less applicable.

-16-

2:16-cv-11055-GCS-SDD   Doc # 48   Filed 06/08/16   Pg 17 of 23   Pg ID 846

which are in any case already protected from dissipation by the escrow arrangement) are encumbered with several senior creditors' security interests.[8]

Therefore, the best way to protect Western from irreparable harm would be to simply put a freeze on the Indemnitors' assets. The Indemnitors should not be allowed to transfer or further encumber their assets, except in the ordinary course of business or to satisfy necessary personal expenses. Given that the existing agreement between the parties already accomplishes this, the Court will simply incorporate that agreement by reference into the instant order. Moreover, the Indemnitors should be required to give Western full access to their financial books and records. This will enable Western to ensure compliance and also enable Western to recognize any additional risks and move for further preliminary injunctive relief if necessary to protect the status quo. *See Ohio Cas. Ins. Co. v. Fratarcangelo*, 7 F. Supp. 3d 206, 217 (D. Conn. 2014) (unpublished); *Auto-Owners Ins. Co. v. Randy B. Terry, Inc.*, No. 5:12-CV-02717-TMP, 2013 WL 6583959, at *8 (N.D. Ala. Dec. 16, 2013) (unpublished).

_____

[8] Although Western has contested the Indemnitors' position that they would be unable to post collateral, the Court credits Parimal Mehta's testimony on this point as well as the Conway MacKenzie liquidation analysis. Even if the Indemnitors could post collateral, the value of the collateral would be substantially discounted due to the numerous senior encumbrances.

The Court also concludes from Mr. Mehta's testimony and the Conway MacKenzie analysis that FNG would go out of business and be forced to liquidate if the Court ordered the Indemnitors to post collateral now. The Conway MacKenzie analysis shows that Western would receive only a small recovery under such a scenario.

The Court is admittedly not convinced that FNG will ever be able to recover and pay Western more at a later time. Mr. Mehta testified that he is trying to restructure FNG to get rid of its unsuccessful construction business and focus entirely on security and IT, but the Court is skeptical given FNG's high level of debt and its lack of a traditional credit source. But this does not negate the fact that Western would likely gain little or nothing from an order requiring the Indemnitors to post collateral at this time.

-17-

### C.    A Freeze on the Transfer of Assets Would Appropriately Balance the Risk of Harm to Western with the Risk of Harm to the Indemnitors.

The third factor weighs against granting Western's requested remedy. There would likely be substantial harm to the Indemnitors and to their employees if the Court were to order the Indemnitors to immediately post $8,250,000 in collateral. However, while the Indemnitors would likely face some hardship if they were enjoined from transferring or encumbering their assets, this harm would be far less serious and irreparable. Thus, this would be a much more appropriate remedy.

The Court finds that FNG (and thus FNSS and Motor City) would likely be forced out of business if the Court were to order the Indemnitors to post $8,250,000 in collateral. The Court also finds that this would result in the loss of at least 200 jobs. This would be a substantial harm to the Indemnitors and to the Indemnitors' employees, and it would be a harm that could not be undone if the Indemnitors were later to prevail on the merits. *See Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1382 (6th Cir. 1995) ("The impending loss or financial ruin [of a party's] business constitutes irreparable injury."); *see also Contech Casting, LLC v. ZF Steering Sys., LLC*, 931 F. Supp. 2d 809, 818 (E.D. Mich. 2013); *Connors v. Shannopin Min. Co.*, 675 F. Supp. 986, 991 (W.D. Pa. 1987) (declining to issue a preliminary injunction ordering the defendant to make payments to which the plaintiff was clearly entitled, because the injunction would have "forc[ed] [the defendant] into insolvency and eliminat[ed] [numerous] jobs").[9]  The Court is unpersuaded, however, that the dissolution of the

---

[9] Western argues that the mere fact that an injunction would result in financial hardship to the enjoined party is insufficient to justify the denial of a preliminary injunction. *See, e.g., Hanover Ins. Co. v. Holley Const. Co. & Associates*, No. 4:11-CV-

Indemnitors' businesses would result in harm to their clients, including the federal government.  Other than Parimal Mehta's fairly conclusory testimony on this point, the Court sees no reason to conclude that FNG's and FNSS's clients would be unable to find a substitute company to supply IT or security services.  At any rate, the likely harm to the Indemnitors and their employees is more than enough to constitute a substantial harm.

The Indemnitors and their employees will suffer less harm if the Court simply orders the Indemnitors not to transfer or encumber their assets except in the ordinary course of business or to satisfy necessary living expenses.  The Indemnitors will still suffer some harm—they will likely have more difficultly obtaining new financing to keep FNG afloat, for example.  But the harm would be far less severe.  Moreover, given the risk of irreparable harm to Western, as explained in the immediately preceding section, *some* harm to the Indemnitors is acceptable.

### D.   The Public Interest Weighs in Favor of Granting Some Limited Preliminary Injunctive Relief.

The fourth preliminary-injunction factor weighs in favor of granting limited preliminary injunctive relief.  The public interest would likely be harmed if the Court were to order relief that would put FNG, FNSS, and Motor City out of business, but the public interest would also be harmed if the Court did nothing to protect Western's rights.

---

41 CDL, 2012 WL 398135, at *6 (M.D. Ga. Feb. 7, 2012) (unpublished).  But the Indemnitors face more than mere financial hardship.  Rather, they face the complete loss of their businesses.  Moreover, hundreds of employees face potential unemployment.

The Court rejects the Indemnitors' argument that requiring the Indemnitors to post collateral—thus forcing them out of business—would harm the public interest by compromising national security.  Courts have unsurprisingly acknowledged that "national security [is] a 'public interest of the highest order.'" *Stagg P.C. v. U.S. Dep't of State*, No. 15-CV-8468, 2016 WL 316859, at *4 (S.D.N.Y. Jan. 26, 2016) (quoting *ACLU v. Clapper*, 785 F.3d 787, 826 (2d Cir. 2015)); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 26 (2008) (refusing to preliminarily enjoin Navy training exercises which were allegedly harming whales because "[t]he public interest in conducting training exercises with active sonar under realistic conditions plainly outweighs the interests advanced by the plaintiffs"); *Battelle Energy All., LLC v. Southfork Sec., Inc.*, 980 F. Supp. 2d 1211, 1221-22 (D. Idaho 2013); *Advanced Rotorcraft Tech., Inc. v. L-3 Commc'ns Corp.*, No. C 06-06470 WHA, 2007 WL 437682, at *10 (N.D. Cal. Feb. 6, 2007) (unpublished).  But the Court is unpersuaded that national security would be threatened if FNG and its subsidiaries were to go out of business.   As explained in the background section, FNSS manufactures active vehicle barriers and has installed them at over 500 military installations and other federal installations.  FNSS also services these barriers.  Moreover, FNG provides IT services to the federal government. But there is no evidence, other than Parimal Mehta's conclusory testimony, that the federal government would be unable to find another company to service the active vehicle barriers or provide IT services if FNG and its subsidiaries were to go out of business.  Mr. Mehta testified that only FNSS "ha[s] the patents" for the active vehicle barriers, but it is unclear why this would disable other companies from servicing the barriers.

-20-

Moreover, another company could—and, given the ostensible profitability of the active-barrier product, probably *would*—purchase the patents.

However, the Court agrees with the Indemnitors' argument that the public interest weighs against the destruction of jobs.  *See generally Connors v. Shannopin Min. Co.*, 675 F. Supp. 986 (W.D. Pa. 1987).  Given that the Indemnitors' companies would almost certainly be forced out of business if the Court were to order them to immediately post $8,250,000 in collateral, the public interest weighs against such an order.

The public interest weighs in favor of granting *some* form of preliminary relief, though, because the public interest generally weighs in favor of enforcing freely negotiated contracts.  *See Am. Motorists Ins. Co. v. Pennsylvania Beads Corp.*, 983 F. Supp. 437, 441 (S.D.N.Y. 1997) ("If anything, public policy considerations dictate against [requiring a creditor to wait until trial to be awarded relief], since it is that precise situation which [the creditor] sought to avoid in bargaining for the collateral security clause.").  Moreover, surety companies that issue bonds for government construction projects provide a necessary service.  *See First Nat'l. Ins. Co. of Am. v. Sappah Bros. Inc.*, 771 F. Supp. 2d 569, 575-76 (E.D.N.C. 2011).  These bonds protect both the government as well as the subcontractors and suppliers.  *See id.*  If courts fail to enforce the indemnity agreements signed as part of these surety arrangements, then "the conditions under which sureties issue bonds may be altered[,] . . . thereby 'frustrat[ing] the government's interest in protecting taxpayer money and those who provide labor on public projects.'"  *Id.* at 576 (quoting *Travelers Cas. & Sur. Co. v. Ockerlund*, No. 04 C 3963, 2004 WL 1794915, at *6 (N.D. Ill. Aug. 6, 2004) (unpublished)).

-21-

Therefore, the Court concludes that the public interest weighs against forcing the Indemnitors to post collateral at this time but weighs in favor of granting more limited preliminary injunctive relief.  In particular, the Court concludes that an order enjoining the Indemnitors from transferring or encumbering their assets except in the ordinary course of business or to satisfy necessary living expenses and requiring the Indemnitors to provide full access to their financial records would adequately protect the public interest.  Because the agreement between the parties (Doc. 35-2) already contains the restriction on transferring or encumbering assets, the Court will incorporate that agreement by reference in the instant order.

### E.     Western Will Not Be Required to Post Security.

Federal Rule of Civil Procedure 65(c) provides that a "court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party [later] found to have been wrongfully enjoined or restrained."  Despite the seemingly mandatory language of Rule 65(c), the Sixth Circuit has repeatedly held that a district court may, within its discretion, properly decline to require the posting of security. *Appalachian Reg'l Healthcare, Inc. v. Coventry Health & Life Ins. Co.*, 714 F.3d 424, 431 (6th Cir. 2013); *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995).  In the instant case, there is no reason for the Court to require Western to post security.  If the Indemnitors are wrongfully harmed as a result of the instant order, they will be able to obtain appropriate relief in the form of damages against Western.   Western is a large and apparently solvent surety company and thus there is no reason to require it to post security in advance.

-22-

## V.  CONCLUSION

Western's motion for a preliminary injunction (Doc. 2) is GRANTED IN PART and DENIED IN PART.  The Court INCORPORATES into the instant order the terms of the Standstill and Negative Pledge Agreement (Doc. 35-2) in its entirety and ORDERS that the prescriptions and proscriptions therein SHALL have the same effect as if expressly ordered by this Court.  In particular, the Indemnitors SHALL NOT transfer, encumber, or dispose of their assets except as permitted by the terms of that agreement.  IT IS FURTHER ORDERED that the Indemnitors SHALL grant full access to their financial books and records to Western.

IT IS SO ORDERED.

Dated:  June 8, 2016

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on June 8, 2016, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk

-23-